IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT COURT OF SOUTH CAROLINA
FLORENCE DIVISION

| | |
|---|---|
| PHOENIX ENTERTAINMENT PARTNERS, LLC, <br><br> Plaintiff, <br><br> v. <br><br> SEMINOLE SPORTS, LLC d/b/a SPENCERZ SPORTS BAR, BRENDA KIDD d/b/a ALLENS HOUSE KARAOKE, <br><br> Defendants. | Case No.: 4:17-cv-01242-RBH <br><br><br> **ORDER OF DEFAULT JUDGMENT AND PERMANENT INJUNCTION AGAINST SEMINOLE SPORTS, LLC d/b/a SPENCERZ SPORTS BAR and BRENDA KIDD d/b/a ALLENS HOUSE KARAOKE** |

This matter is before the Court upon the Motion of Plaintiff, Phoenix Entertainment Partners, LLC (hereinafter "Phoenix"), pursuant to Fed. R. Civ. P. 55(b)(2), for a judgment by default against Defendants Seminole Sports, LLC d/b/a Spencerz Sports Bar ("Seminole") and Brenda Kidd d/b/a Allens House Karaoke (individually "Kidd," collectively with Seminole, the "Defendants," and each individually a "Defendant"). Based upon a review of the evidence before the Court, the Court makes the following:

**FINDINGS OF FACT**

1. On May 13, 2017, Phoenix commenced this lawsuit against Defendants alleging trademark infringement involving counterfeiting, unfair competition and a violation of South Carolina's Unfair Trade Practices Act.

2. On June 16, 2017, Kidd was duly served with the Complaint and Summons issued by the Clerk.

3. On June 21, 2017, Seminole was duly served with the Complaint and Summons issued by the Clerk.

4. Defendants failed to answer or otherwise respond to the Complaint within the time required by Fed. R. Civ. P. 12.

5. On November 29, 2017, a default was entered against Defendants.

By virtue of their default, the Court makes the following findings:

6. At all times relevant to this action, Phoenix was the owner of U.S. Trademark Registration No. 4,099,045, for the word mark SOUND CHOICE®, and of U.S. Trademark Registration No. 4,099,052, for the design mark SOUND CHOICE & Design® (the "Marks").

7. Phoenix consistently used the ® symbol to denote the registration of the Marks and thereby to give notice to the public that the Marks are federally registered.

8. Seminole hired a contractor, Kidd, to provide commercial karaoke services at its bar on at least two (2) occasions and had the right and ability to control whether its contractor used authentic or counterfeit materials to provide services.

9. Seminole had actual knowledge of the infringing and counterfeit nature of Kidd's karaoke materials.

10. Despite that knowledge, Seminole refused to terminate Kidd's services and continued to receive a financial benefit from the provision of infringing karaoke services at its establishment through the attraction of paying patrons to its establishment.

11. Defendants used a reproduction, counterfeit, or copy of the Marks in connection with providing karaoke services, by displaying that reproduction, counterfeit, or copy during the provision of their services.

12. Defendants did not have a license to create digitized copies of Phoenix's karaoke discs or of the karaoke music tracks contained thereon.

13. An unauthorized digitized copy of Phoenix's karaoke discs or karaoke music tracks is a counterfeit.

14. Defendants did not have a license to use counterfeit tracks in connection with their provision of karaoke services.

15. Defendants' unauthorized use of counterfeits of the Marks is likely to cause consumer confusion by deceiving Defendants' customers and patrons into believing that Defendants' services are being provided with Phoenix's authorization.

16. Defendants' actions were willful and knowing.

17. Seminole has the right to control the means and the details of the process by which its third-party agent accomplishes its respective tasks, including, without limitation, controlling the dates and starting and stopping times of shows, determining whether particular content (such as offensive-language content) is permitted to be played at shows, determining the style and genre of music played at shows, and determining whether the third-party agent is permitted to use Seminole's equipment (such as television displays, sound equipment, stage, etc.) as part of the shows.

18. Seminole has the right to control whether or not the activities occur on its premises.

19. Seminole had knowledge of Kidd's direct infringement of the Sound Choice Marks.

20. Despite this knowledge, Seminole continued to use Kidd to commit direct infringement of the Sound Choice Marks during the course of providing karaoke entertainment services to its patrons.

21. Seminole had the right and ability to supervise its contractor's activities in its establishment, including, without limitation, the right and ability to determine whether Kidd provided karaoke entertainment services in connection with the Sound Choice Marks.

22. Seminole knew or had reason to know, based on the amounts it was paying Kidd to provide the services, its interaction with Kidd, and its knowledge of Kidd's infringement, that Kidd was unlikely to be able to respond for significant damages for infringement.

23. The arrangement between Seminole and Kidd exploited Kidd's marginal financial condition in two ways: first, by reducing the amount Seminole had to pay Kidd to provide the services in a manner that would be profitable to Kidd; and second, by attempting to allocate the burden of any claims of infringement to Kidd, an undercapitalized "dummy" operation, in a naked effort to avoid financial responsibility and liability for the infringement while remaining the principal beneficiary of the infringement.

24. The arrangement between Defendants is a sham designed to reap the rewards of infringement while escaping the liabilities.

25. Despite Seminole having knowledge of the infringing character of the activities and the ability to control whether those activities occur, Seminole elected not to stop the infringement from occurring, instead continuing to enjoy the benefits of the infringement even after the commencement of the lawsuit.

26. To the extent that it is not directly liable as an infringer, Seminole is secondarily liable for the continuing infringement that has occurred and is occurring on its premises.

27. Phoenix has been harmed by Defendants' infringing activities and will continue to be harmed if Defendants are not enjoined from further infringement.

28. Phoenix has elected to receive an award of statutory damages from Defendants.

Based upon the foregoing facts, the Court makes the following:

## **CONCLUSIONS OF LAW**

1. This Court has jurisdiction over the subject matter of this action as it arises under an act of Congress relating to trademarks, particularly including federally registered trademarks.

2. This Court has personal jurisdiction over the parties, and venue is proper in this judicial district.

3. By virtue of Defendants' defaults, the allegations pled in the Complaint are deemed to have been admitted by Defendants.

4. By using counterfeit materials bearing the Marks to put on karaoke shows and by displaying the Marks during the course of those shows at Seminole's establishment, Defendants have committed acts that are likely to cause confusion among consumers of their services as to authorization, sponsorship, and affiliation of its services by or with Phoenix. In particular, customers and/or patrons who visit Seminole's establishment are likely to be deceived into believing that the karaoke services are being provided with Phoenix's authorization.

5. Seminole had the right and ability to supervise the infringing activity and had a direct financial interest in the infringing activity.

6. Consequently, Defendants' activities constitute trademark infringement involving counterfeiting.

7. Seminole is vicariously liable for the infringing actions of Kidd.

8. Defendants' infringement was willful and knowing.

9. Phoenix is entitled to a damage award for infringement of its registered trademarks in an amount between $1,000.00 and $2,000,000.00 per mark, as the Court may determine.

10. The Court finds that an award of $1,000.00 is supported by the evidence of record and will be sufficient to compensate Phoenix for its losses and to deter others from engaging in similar conduct.

11. As the prevailing party in this matter involving willful and deliberate infringement by Defendants, Phoenix is also entitled to attorneys' fees and costs in the amount of $3,762.50. The Court finds that the sum of $3,762.50 is reasonable and appropriate.

12. Phoenix is entitled to a permanent injunction against Defendants' acts of infringement of its trademarks.

## JUDGMENT AND PERMANENT INJUNCTION

Accordingly, it is ORDERED, ADJUDGED, and DECREED as follows:

1. Judgment by default is hereby entered in favor of Phoenix against Defendants, jointly and severally.

2. Pursuant to 15 U.S.C. § 1117, Defendants are hereby ordered to pay the sum of $4,762.50 to Phoenix, with accrual of interest from the date of entry of this judgment until paid at the legal rate, pursuant to 28 U.S.C. § 1961.

3. Defendants and their agents, employees, and all persons in active concert or participation with them and having knowledge of this Order are hereby permanently ENJOINED:

    (a) from using or displaying (including making, copying, sharing, distributing, selling, or otherwise using, and particularly including use to provide karaoke services), commercially or otherwise, any karaoke accompaniment track that is marked with either the mark in U.S. Trademark Registration No. 4,099,045, for the word trademark SOUND CHOICE®, or the mark in U.S. Trademark Registration No. 4,099,052, for the design trademark SOUND CHOICE & Design®, without the prior, express written permission of Phoenix or its successor-in-interest, if any, to the ownership of those marks or in any manner that is inconsistent with the following media-shifting policy established by Phoenix:

    (i) The karaoke host must purchase one authorized copy of each Sound Choice karaoke track on an authorized, original medium (CD) for each alternative medium (such as a hard drive) to which the host wishes to shift the content.

    (ii) If a track is shifted to another medium, the entire track must be shifted (i.e., no "chopping").

    (iii) The karaoke host must maintain ownership and possession of both the authorized original medium and the alternative medium during the entire time in which the content has been shifted to the alternative medium.

    (iv) The karaoke host must not use the authorized original medium to produce a karaoke show or for any other commercial purpose (including shifting the content to

another alternative medium) during the time in which the content has been shifted to the alternative medium.

    (v) If the karaoke host discontinues possession of either the authorized original medium or the alternative medium, the associated tracks must be removed from the alternative medium.

    (vi) The karaoke host notifies Phoenix that the karaoke host intends to conduct or has conducted a media-shift or format-shift, and submits to a verification of adherence to Phoenix's policy; and

  (b) from making, copying, sharing, distributing, selling, or otherwise using digitized copies of karaoke accompaniment tracks, commercially or otherwise, which tracks are marked with any mark or other designation belong to any person from whom Defendants have not obtained written authorization from the owner thereof to make, copy, share, distribute, sell, or otherwise use the digitized copy.

**IT IS SO ORDERED.**

August 24, 2018　　　　　　　　　　　　　　　　　s/ R. Bryan Harwell
Florence, South Carolina　　　　　　　　　　　　　R. Bryan Harwell
　　　　　　　　　　　　　　　　　　　　　　　　United States District Judge